Mr. Justice Van Oksdel
delivered the opinion of the Court:
Appellant, Charles M. Manly, appeals from the decision of the Commissioner of Patents, awarding priority of invention to appellee, Harvey D. Williams, the senior party. The issue-is concisely stated by the Examiner of Interferences, as follows:- “This case is here for final decision upon the question, of priority of invention. Manly is the holder of a patent for the invention in issue. This patent issued, however, on an>. application filed after the filing of Williams’s application. The* issue of Manly’s patent was therefore presumably inadvertent. Manly, in his preliminary statement, failed to allege dates of invention prior to Williams’s filing date. He was therefore- *196 required to show cause why judgment should not be entered against him. In response to that order, he had the .case set down for final hearing upon the application records. He contends that these show that Williams is estopped from asserting any claim to priority of invention upon his application, and that, for such reason, Manly must be adjudged the prior inventor.”
It appears that shortly after the issue of the patent to appellant, the Primary Examiner notified appellee, in case he desired an interference, to malee the claims of the patent now in issue. Some months thereafter appellee took action upon his application, declining, however, to make the claims. More than two years after the date, when the claims were suggested to appellee, he tendered them, and this interference was declared.
The claims in issue are as follows:
“1. In a variable-speed gear, the combination with a pump and a motor having a fluid connection between them, means for collecting leakage of an auxiliary pump adapted to return to the fluid connection such leakage, substantially as described.
“2. In a variable-speed gear, the combination with a pump and a motor having a fluid connection between them, of a pump automatically operating to return to the fluid connection any leakage therefrom, substantially as described.”
The principal point relied upon by appellant in the Patent Office, which was sustained by the Examiner of Interferences, but denied by the Board of Examiners-in-Chief and the Commissioner, is that appellee’s deliberate delay of more than two years in offering these claims operated as an estoppel, and is sufficient to support a judgment of priority in favor of appellant. An additional ground is advanced by counsel for appellant in this court. It is insisted that, inasmuch as appellee seeks to adopt the claims in issue and have them relate back to the date of his original application, before he is entitled to .adopt the claims, it must clearly appear that the invention in issue was set forth in his original application. It is vigorously *197 argued that this does not appear from the original specifications and claims of appellee.
This appeal, we think, can be disposed of upon the latter point. The general invention common to both parties relates to a “variable-speed gear,” which is a device by which two shafts may be geared together so that one will operate the other in such a manner that both will revolve at the same rate of speed. It involves in its organization the use of fluid, preferably oil, which is operated upon by a pump, and which in turn operates a motor, so that the fluid forms a connection between the pump and the motor, the successful operation of which depends upon maintaining at all times a uniform amount of fluid in the fluid connection.
It is conceded that considerable leakage occurs in the operation. It follows that, unless this leakage can all be conserved, the original supply must be replenished from time to time. Oil will be thrown out by the rapidly revolving shafts and the operation of the machinery. To collect this leakage, appellant surrounded the machine with a tight tubular casing which does not permit the leaking oil to escape, but returns it to the pump, to be again used in the fluid connection. Appellant, in his specifications in which the claims in controversy originated, describing his apparatus, states: “It is furthermore evident that should any leakage occur around the pistons of the pump and motor, or their respective piston valves, such leakage will finally settle to the lower portion of the inclosing casings, and I have provided for returning this fluid to the reservoir, and from this to the fluid connection.”
Appellee’s device shows a casing only about the lower portion of the machine. In the bottom of this casing a reservoir is provided from which the oil is pumped into the fluid connection. The portion of the leakage caught by this partial casing is returned to the tank, but it is .clearly apparent that in this device a large part of the leakage is lost. It was to obviate this difficulty that the Examiner suggested to appellee the claims in issue, which were copied from appellant’s original application.
An examination of appellee’s claims, specifications, and draw *198 ings, we think, discloses no conception by him of the exact thing here in issue. In his original specifications he describes this feature of his invention as an “apparatus mounted upon a frame or stand 1, which, in this case, is preferably in the nature of an open box having a tight bottom which will catch and carry oil or other medium which may be employed to charge the apparatus. At the bottom, in the center, is a sink 75, which serves as a settling basin, and into which the suction plug 10 of the replenishing tank projects.”
He further describes it as follows: “In practice the piston chambers of the pump cylinders, the port channels, and the perts are filled with the circulating medium, which preferably is a lubricant, and for convenience will hereafter be called an ‘oil.’ As, under certain conditions, this oil is driven around the circulatory track under enormous pressure, there is liable to be some loss from leakage, which, in a short period of operation, would exhaust the apparatus unless such waste be replenished as fast as it occurs. For this purpose a special pumping apparatus is provided which draws from a supply of oil carried in a well or reservoir 75, beneath the machine. The oil so drawn from this reservoir is automatically gauged to accurately supply for the depletion as it occurs, so that no more than is requisite for that purpose will be taken up on injected.”
Again it is described as follows: “On the exhaust side the •oil is returned by the action of the pistons connected with the driven mechanism, but, as some degree of leakage of the oil in transmission may exist, it is apparent that the return current from the exhaust port will not be sufficient to keep the pit-man heads in close connection in their sockets, as the pistons on the receiving end of the exhaust side might not make a full stroke on account of leakage on that side of the machine. Hence the replenishing pump is provided to force oil into the exhaust port, so as to keep the system full, and also to establish therein a pressure sufficiently above the normal to force the pistons of the driving and driven ends apart, and thereby seat the terminals of the pitmen in their respective sockets in the piston and socket rings.”
*199 In describing the operation of the machine, appellant states: “To put the machine in adjustment for operation, the sink should be supplied with a sufficiency of oil to fully charge the system, and leave a reserve to draw from to supply leakage.”
Paragraph 5 of his claims is as follows: “In a fluid power transmission device, the combination with a set of injecting pumps and a set of receiving pumps, the former adapted to be connected with the power to act as drivers, and the latter with the load or driven mechanism, and act as motors, of an interposed valve plate having transmission ports, means connected with the pumps for mounting, rotating, and reciprocating them collectively, and provisions connected with the circulatory channels for replenishing the waste of the circulating medium resulting from leakage or otherwise, substantially as specified.”
In paragraphs 8, 9, 10, and 11 of the original claims, it was referred to as means for replenishing waste in the circulation.
In 1902 new claims were inserted by appellee, in which it is again referred to as means for “replenishing' waste of the circulating medium resulting from leakage or otherwise,” “to replenish wasted circulation,” and “replenishing in the circulation.” In 1901 a new claim was inserted as follows: “A power transmission device of the kind described * * * fluid transmission conduits connecting said sections, an injecting device connected with said transmission conduits, and a source of fluid supply for replenishing waste in the circulation, arranged and adapted to operate as and for the purpose specified.”
This was the condition of appellee’s claims and specifications when appellant came into the field, and when the Primary Examiner notified appellee to make the claims here in issue. It is clear that if appellee had not, prior to this, disclosed in his claims, specifications, or drawings some conception of the thing in issue, he would be estopped to thereafter claim it. Some months after this notice was given, appellee filed additional claims, stating at the same time that he did not desire to make the claims suggested at that time. In these additional claims he refers to “a chamber for receiving any fluid which may *200 leak through the joint between the barrel and the valve plate,” “a chamber for receiving any fluid which may leak out of the-circulating space, and a return channel leading from said chamber to the circulating space,” “a chamber for receiving any leakage of fluid from sáid confined spaces,” “a chamber for collecting any fluid leaking out of said confined space, and a replenishing channel leading from said chamber to the suction side of said confined space,” “a chamber adapted to receive any leakage of the operating fluid, and a replenishing channel leading from said chamber to the spase containing the operating fluid,” “a. chamber for receiving any leakage of the operating fluid, and a replenishing channel for leading the fluid from such chamber to the suction or lower pressure portion of the operating fluid,” and “a chamber for receiving the leakage of the operating fluid, and-a valved replenishing channel leading from said chamber to the suction portion of the operating fluid.”
In May, 1906, the application was amended by adding certain additional claims in which it was described as “a chamber for receiving any leakage from that part of the device which is under pressure, a valved connection from said receiving chamber to each of the said channels,” and “a chamber for receiving any fluid which may leak from that part of the device which is under pressure, a connection from said chamber to the low-pressure part of the device.”
In March, 1901, appellee erased certain of the above claims, and inserted additional claims, in which he describes “a fluid power transmission device, the combination with driving mechanism for imparting motion to the fluid, and driven mechanism adapted to be operated by such moving fluid, of a chamber located below the space in which the fluid circulates, and arranged to receive any leakage from the circulating space, and a replenishing channel for leading the fluid upward from said chamber back to the circulating space.”
It will be observed that when appellant entered the field, ap* pellee had apparently no concejdion of the necessity of conserving the leakage. His idea was to provide against leakage *201 by replenishing the supply of oil in the tank. It is insisted by counsel for appellee that the word “replenishing” is comprehensive enough to convey his conception of means for the' collection of leakage; but, in the absence of anything in the' context to indicate such a meaning, we cannot attribute this intention to appellee. In fact, the claims and specifications of' appellee, up to the date of appellant’s entry into the field, clearly indicate the contrary.
When we consider appellee’s refusal for more than two years to make the claims suggested, and his failure to embrace the-idea in amendments during that period, it is apparent that he had no conception whatever of the invention embraced in the1 claims in issue until after appellant entered the field. Even then he was unable to so amend his claims as to intelligently express anything like a clear conception of the thing here in. issue.
The law is well settled that amendments will only be permitted to relate back to the date of the filing of the original application, where they can clearly be sustained on the claims and specifications as originally made. The law does not permit such an enlargement of the original specifications as will interfere with other inventors who have acquired intervening rights. “Courts should regard with jealousy and disfavor any attempts-to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patenteeto appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into-public use.” Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 24 L. ed. 1053. The rule is the same as in reissue cases with respect to intervening rights. A patentee cannot, in a reissue-application, so broaden his claims as to include an invention made subsequent to the grant of his patent. Newton v. Furst & B. Co., 119 U. S. 373, 30 L. ed. 442, 7 Sup. Ct. Rep. 369 ; White v. Dunbar, 119 U. S. 47, 30 L. ed. 303, 7 Sup. Ct. Rep. 72; Brown v. Davis, 116 U. S. 237, 29 L. ed. 659, 6 Sup. Ct. Rep. 379; Miller v. Bridgeport Brass Co. 104 U. S. 350, 26 L. ed. 783; Topliff v. Topliff, 145 U. S. 156, 36 L. ed. 658, 12 *202 Sup. Ct. Rep. 825; Giant Powder Co. v. California Powder Works, 98 U. S. 126, 25 L. ed. 77.
It is urged by counsel for appellee that the question that the claims in interference do not show the same invention as that shown by appellee in his original application was not raised In.the Patent Office, and therefore cannot be advanced for the first time in this court. In Lecroix v. Tyberg, 33 App. D. C. 586, we said: “It is also urged that the Commissioner erred in awarding priority of invention to Tyberg on count 4, because •the applications of the respective parties, so far as this count is concerned, do not show the same invention. This question can-mot be raised for the first time at this stage of the proceeding. It should have been raised by appropriate motion before the Patent Office, and brought here on appeal.” This court has also field that it is incumbent upon a litigant to raise this question before the Primary Examiner, as we will not permit a party to try his case backwards. Cutler v. Leonard, 31 App. D. C. 297.
But this strict rule cannot be here invoked, for the reason that appellant seasonably filed a motion which we think is broad •enough to bring the issue before us. When this case was pending before the examiner of interferences, appellant filed a motion to dissolve the interference upon the ground of laches and estoppel, and also upon the express allegation that “said Williams fias no right to make the claims of the issue, because at and before the date of making said claims, intervening rights had accrued.” Appellant “further moved that the files and papers be transmitted to the Primary Examiner for determination of the motion for dissolution, and that the interference proceedings be suspended pending the final determination thereof.” 'This motion the Examiner of Interferences refused to transmit "to the Primary Examiner, and an appeal was taken to the Commissioner, where the ruling of the Examiner of Interfer•ences was sustained. The matter was referred back to the Examiner, the Commissioner holding that the motion could be ■considered on final hearing.
This motion, we think, is sufficient to raise the issue, since *203 "the question presented is not one of fact, but one of disclosure. Appellee in his original specification and the amendments there•of up to the time appellant entered the field, totally failed to make any claim for means for collecting leakage. If appellee lad made any such claim there would be presented a question of fact as to its operation, but in the absence of any such claim, the sole question here is whether he can now claim something which was not originally disclosed. Upon this point there can be no room for doubt that the motion to dissolve was broad ■enough to permit appellant to contest appellee’s right to make the claims in any or all of the tribunals through which the •cause has come by appeal.
The decision of the Commissioner is reversed, and the clerk is directed to certify these proceedings as by law required.

Reversed.