Jonas H. CROWSON, Plaintiff,

v.

Dan J. DENNINGTON, Joe Dennington, and Sid Dennington, d/b/a Dennington Cane Company, Defendants.

No. 562.

United States District Court
W. D. Arkansas, Texarkana Division.
June 11, 1956.

George F. Edwardes, Texarkana, Ark., William E. Wiggins, Texarkana, Tex., for plaintiff.

Shaver, Tackett, Jones & Lowe, Boyd Tackett, Paul Jones, Texarkana, Ark., for defendants.

LEMLEY, Chief Judge.

This cause having been tried to the Court, this memorandum is filed in lieu of separate findings of fact and conclusions of law, as authorized by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

By this action the plaintiff, Jonas H. Crowson, seeks injunctive relief and damages against the defendant, Dan J. Dennington,[1] for an alleged infringement of letters patent No. 2,574,248 covering a machine for the straightening of cane fishing poles.

In his amended complaint, plaintiff alleges that the patent was issued on November 6, 1951, and that the defendant has been infringing thereon for five or six years prior to the filing of the suit. In his answer the defendant, among other things, denies the validity of the patent and also denies infringement.

The patent in suit consists of four claims and discloses a machine consisting principally of three cylindrical rollers, two of which are mounted parallel to each other on a metal frame and the third of which is superimposed upon the other two so as "to define in the center * * * a pole receiving space extending from end to end of the rollers and bounded throughout its length by the sidewalls of the rollers." The top roller is "adjustable toward and away from the other rollers," that is to say, its front end can be raised or lowered by means of a hand lever and pull-back spring depicted in the drawings and referred to in the patent. The rollers themselves are described in claim 3 of the patent as follows:

"* * * each roller having one end portion formed with undulations and its other end portion formed cylindrically, the first named end por-

---

1. The action was originally commenced against Dan J. Dennington, Sid Dennington and Joe Dennington, alleged to be parters doing business as Dennington Cane Company; prior to the commencement of the trial the case was dismissed as to Joe Dennington for lack of service, and at the conclusion of plaintiff's case the action was dismissed as to Sid Dennington in view of undisputed evidence to the effect that he had no interest in Dennington Cane Company; since Dan J. Dennington was left as the sole defendant in the case, we shall refer to him as though he had been sued alone originally.

tion of the rollers being substantially co-extensive in length and in opposed relation to each other, the undulations of one of the rollers being staggered relative to the undulations of the other two rollers for pressing out crooked portions of a pole."

In the fourth claim those undulations are referred to as "one or more alternating circumferential crests and valleys; the crests and valleys of at least one of the rollers being staggered relative to the crests and valleys of the other rollers adjacent thereto and being adapted to engage crooked portions of (a) pole." In that claim the remaining portions of the rollers are described as "being formed of constant diameter for preventing reversion of a straight pole to crooked shape." The machine also includes a heating apparatus for the softening of the poles to be straightened, which apparatus is located underneath the undulating portions of the rollers. When the machine is in operation, the rollers are rotating in one direction as a result of which the pole under treatment is rotated in the opposite direction; the rotation of the rollers can be achieved by "any suitable drive."

According to the patent, the main object of the invention is to provide a machine of the character described adapted to straighten poles speedily and efficiently "by permitting their passage longitudinally of and between a series of rotating rollers, with said rollers being novelly formed in a manner to remove all kinks, bends and other crooked portions, so as to provide a pole substantially straight from end to end."

The operation of the machine is described as follows:

"In use, the heating means is turned on, so that heat will rise up into the space between the undulating portion of the three straightening rollers. A pole P is now insert-ed in the front end of the machine, * * * The heat makes the poles pliable and easy to work, so as to assist the undulating portions of the rollers in straightening the poles. In any event, the undulating portions of the straightening rollers all rotate in one direction, and engage between them the pole P, thus rotating it in an opposite direction. The pole is fed lengthwise of the machine, from front to rear, and as it passes between the undulated portions of the rollers, all bends, kinks, and curves in the pole are effectively removed. The pole then passes between the straight or cylindrical portions of the rollers, and these straight portions hold the pole straight while it is cooling, eliminating any tendency on the part of the pole to return to its previously crooked shape * * * Pole P, as portions thereof are straightened, is periodically advanced until it has passed completely through the machine. While the straightener is in operation the top roller is floating on the pole to take care of the size and taper of the pole."

The evidence in the case discloses that the plaintiff is 86 years old and is an inventor of long experience and considerable talent. His inventiveness goes back to at least 1906 and since that time he has invented a number of useful devices for which patents have been issued. The evidence also discloses that about 1946 the plaintiff, after a number of unsuccessful efforts to work out an efficient machine to be used in his then business of manufacturing and selling cane fishing poles conceived and reduced to practice the machine described in the patent in suit, and actually used that machine for a time in his manufacturing operation, although said machine was not used for a very long period of time.[2]

---

**2.** On this point the evidence on behalf of the plaintiff was to the effect that the undulations on the rollers described in the patent were expensive to install, that they tended to wear out, and were subject to breakage.

Prior to 1947 the defendant, Dennington, was connected with the plaintiff in the latter's business from time to time, but in the year just mentioned he went into the cane manufacturing business for himself, using in his process a machine presently to be described, and which machine the plaintiff contends infringes his patent. The evidence indicates that the defendant is an aggressive manufacturer and salesman, and it was not long before he achieved mass production of his poles, and by 1951 his competition had in effect forced the plaintiff out of business.

In the manufacture of poles the defendant, of course, is required to straighten them, and in his straightening process he makes use of a machine which generally resembles in size and shape that covered by plaintiff's patent. The defendant's machine consists of three cylindrical rollers without undulations arranged in relation to each other in a manner practically identical to the arrangement of the rollers in the plaintiff's machine, and which also contains a pole receiving space between the rollers. The top roller of the defendant's machine is also "adjustable toward and away" from the bottom two by means of a foot pedal and when the machine is in operation, the rollers are mechanically rotated. As pointed out, the defendant's rollers have no undulations, nor does it have a heating apparatus under the rollers; it does have a feature that is absent from the plaintiff's machine, namely a water cooling device located above the rollers, which accelerates the cooling of the poles after straightening.

To operate the defendant's machine the operator introduces one end of the crooked pole to be straightened into the receiving space between the rotating rollers by lifting and then lowering, by means of the foot pedal, the movable top roller. Heat is then applied by said operator to the portion of the pole to be straightened by means of a gas burner

located outside the roller assembly, and he then by the use of hand and eye straightens the pole over the burner; after a portion of the pole is straightened, the operator again lifts the top roller, and thrusts the straightened portion between the rollers, where it is water cooled and held straight; this process is continued until the entire pole has been straightened and thrust into the roller assembly. After completion of the straightening and cooling, the pole under treatment is removed from the assembly and put into an adjacent trough for further cooling, after which it is taken to another machine for staining.

From the foregoing it is at once apparent that in both of the processes here involved [3] the pole to be straightened is first made soft and pliant by heat, the bends and kinks are then removed and the straightened pole is held straight until it cools, after which it remains straight; it is equally apparent, however, that when the patented machine is in use, the poles are heated while they are in the machine and are straightend mechanically by the action of the undulating portions of the rollers, whereas the defendant heats his poles outside of the machine and straightens them by hand. Thus, actually, the only two things that the two processes have in common are the rotation of the poles by means of rollers, arranged as has been stated, and the holding of the poles straight within the roller assembly until they have been cooled.

In passing upon the contentions of the parties, we take up first the question of infringement since, if we find that no infringement exists, it will become unnecessary for us to pass upon the question of validity of the patent or upon certain other defenses tendered by the defendant. Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947; Shakespeare Co. v. Perrine Mfg. Co., 8 Cir., 91 F.2d 199.

"Infringement" is defined by 35 U.S.C.A. § 271(a), as follows: "Whoever

3. It is pointed out that the plaintiff does not have or claim a patent on the process whereby a pole is straightened but only on the machine which does the straightening.

without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." Since neither plaintiff nor defendant is engaged in the business of selling machines, the defendant's infringement, if it exists, must be found in a substantial duplication of the device described in the patent in suit followed by its use in his manufacturing process. On the issue of infringement the burden is upon the plaintiff, and in our opinion he has failed to discharge that burden; on the other hand, we are satisfied that no infringement exists.

■ Generally speaking, the test of infringement is whether or not the accused device performs the same work as the patented device in substantially the same way and accomplishes substantially the same result; if so, there is an infringement even though there may be variations in form, nomenclature or proportion. 40 Am.Jur. "Patents," Section 155, p. 643; Electric Protection Co. v. American Bank, etc., Co., 8 Cir., 184 F. 916; McKays Co. v. Penn Electric Switch Co., 8 Cir., 60 F.2d 762; Irvin v. Buick Motor Co., supra, 8 Cir., 88 F.2d 947; Montgomery Ward & Co. v. Clair, 8 Cir., 123 F.2d 878. In the case last cited the Court said: "* * * It is settled that 'to sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and cooperate to produce result. If the devices are substantially different in either of respects, the charge of infringement is not sustained.' [Citing cases.] It is necessary therefore in determining the question of infringement to look at the mode of operation or the way the device works, together with the result and the means by which that result is attained." 123 F.2d 878, 881.

■ When the plaintiff's machine and that of the defendant are compared in the light of the principles just mentioned, it is seen that the two devices do not perform the same work in substantially the same way and do not obtain substantially the same results. Hence, there is no infringement. The plaintiff's patent covers a machine which in one integrated operation heats the poles, mechanically straightens them, and holds them straight while they cool. While the defendant also straightens poles as part of his manufacturing process, he does not do so mechanically; in his operation the heating of the poles takes place outside the machine, and the poles are manually straightened by skilled workmen, who are required to employ judgment and dexterity in performing their task. As a matter of fact, the evidence in the case shows that the defendant's machine will not straighten a pole, and that if a crooked pole is inserted between the rotating rollers, it will be broken. Although the defendant's machine performs functions in the overall process of pole straightening which are necessary, such functions are auxiliary to the manual straightening that has been mentioned, whereas in the plaintiff's process the machine is all in all. Actually, it seems to us that the very gist of the plaintiff's invention is the substitution of the mechanical straightening of poles by means of the undulations or crests and valleys for the manual straightening of poles which the defendant has always employed.

It is recognized that the end result of the defendant's *process* is the same as the result obtained by the plaintiff's patented *machine;* but we are not here concerned with the comparison of a process with a machine, but with a comparison between two *machines*. Bearing that in mind, it is at once plain that those two machines do not do the same work and do not accomplish the same result, even though a straightened pole emerges from both of them as the end result of the entire process. In that connection Mr. Joe Wilson, the defendant's expert witness, testified that the plaintiff's machine could aptly be referred to as a "pole straightener," but that such term could

not be properly applied to the machine of the defendant, which, he termed a "pole conditioner," that is to say, a machine designed to hold a manually straightened pole in that condition until it can be cooled by the employment of the water cooling device that has been mentioned.

It is true that there may be an infringement by the use of equivalents, but it is clear to us that the defendant does not employ any mechanical equivalent to the undulations which constitute an essential part of the plaintiff's machine, and the manual straightening of poles which the defendant employs cannot be considered as an equivalent of the mechanical straightening which in the plaintiff's machine is accomplished by the action of the undulations upon the heat softened poles.

In Mantz v. Kersting, D.C.Cal., 29 F. Supp. 706, 710, Judge Yankwich had this to say:

"A manual operation is not the equivalent of a mechanical means for performing it or of automatic action. As said in Brown v. Davis, 1885, 116 U.S. 237, 249, 6 S.Ct. 379, 386, 29 L.Ed. 659: 'But the lever, or its equivalent, *as a mechanical instrument*, is made an essential element in claim 2; and dispensing with the lever, and *using instead the human hand*, is not the use of an equivalent, although in the plaintiffs' machine the hand is applied to work the lever.* * *'

* * * * * * .

" * * * Here, in the installation of the accused device, the tension adjustment is achieved by a machine shop or factory operation prior to the placing of the spring onto the drum, i. e. *before assembly*. Thereafter, no adjustment can be made. In the patented device, the adjustment of tension is achieved, after the device is assembled, by means of the rotatable axle and the disc. We thus have, in the patented device, a mechanical means for securing proper tension. In the ac-

cused device, we have no such means. Instead, *we have a manual handling before assembly*. The one is not the equivalent of the other. * * *" (Emphasis in opinion.)

And in Republic Iron & Steel Co. v. Youngstown Sheet & Tube Co., 6 Cir., 272 F. 386, 392, the court said: "A manual handling is not the equivalent of a claimed mechanism. Brown v. Davis, 116 U.S. 237, 249, 6 S.Ct. 379, 29 L.Ed. 659."

In Brown v. Davis, supra, referred to in both of the cases just cited, the patented device was a grain drill which had a lever attachment, worked by hand, which could change the alignment of the seeding "hoes" or "shoes" in the accused device such alignment was changed by the operator's physically pulling upon a metal rod, no lever being involved. The Supreme Court held that the manual operation in the accused device was not the equivalent of the mechanical lever in the patented device even though the lever in that device was worked by hand.

To our mind the instant case is much stronger from the defendant's standpoint than the one just mentioned. In that case the human being in operating the patented device employed a lever, whereas the operator of the accused device physically pulled on a rod, and there would seem little difference between the two, and, indeed, the trial court found that the one was the equivalent of the other. Here, however, there is a vast difference between straightening a pole by hand and straightening it by machine. The operator in the defendant's process is required, first, to perceive the bend or kink that is to be removed, a function which involves human eyesight and attention; in the plaintiff's machine, however, the undulations in the rollers detect the crooks and bends. In the defendant's process after the operator has detected a crook, he must apply heat to soften the pole, the determination of the amount of which involves judgment, and he must then manually straighten the pole by

bending it back the requisite distance,[4] which requires the exercise of judgment, dexterity and skill; in the plaintiff's machine, however, the straightening is entirely mechanical and automatic and is achieved by action of the undulations in bending the softened pole in first one direction and then the other so as to break down the fiber of the pole and straighten it. In our estimation, those differences are more than differences in degree—they are differences in principle, the age-old differences between handwork and machine production.

That the manual straightening of poles employed in the defendant's operation requires the exercise of human judgment, attention, dexterity and skill is demonstrated by the fact, established by the evidence, that many persons employed by the defendant are never able to learn to straighten poles properly, that all have to be trained, and that there is a material loss of poles on account of breakage and other imperfections of technique.

■■ It may be conceded that the two machines with which we are concerned resemble each other generally in size and shape, and that they possess elements in common in that in both the poles are introduced to a roller assembly, rotated therein, and held there while cooling. But it is not sufficient to spell out an infringement to show that the accused device resembles the patented machine, or that the two have elements in common. As pointed out, there must be substantial identity of function, means and result, and such identity is lacking here. Moreover, as shown by the history of this patent, introduced in evidence, and by the testimony of Mr. Wilson, there is nothing new in utilizing three rotating rollers, one superimposed upon the other two, as a straightening device.

Let a judgment be entered dismissing the complaint herein with prejudice, and at the plaintiff's cost.

---

4. In manually straightening a pole, when a bend is encountered, the operator bends the heat softened pole back to a position which the witnesses described as "more than straight."