McGRAW EDISON COMPANY,
Plaintiff,

v.

CENTRAL TRANSFORMER CORP.,
Defendant.

Civ. A. No. 2960.

United States District Court
E. D. Arkansas, W. D.

June 23. 1961.

John T. Williams, Little Rock, Ark., James Van Santen, Charles F. Meroni, Chicago, Ill., for plaintiff.

Bridges & Young, Pine Bluff, Ark., John H. Sutherland, St. Louis, Mo., Heiskell Weatherford, Jr., Memphis, Tenn., for defendant.

HENLEY, Chief Judge.

This suit for alleged patent infringement and unfair competition was brought by plaintiff, McGraw Edison Company, a Pennsylvania concern, formerly McGraw Electric Company, against Central Transformer Corp., an Arkansas corporation, which has its principal place of business at Pine Bluff. It is now before the Court on exceptions to the report filed April 1, 1960, by Special Master Robert S. Lindsey to whom the cause was referred in 1957.

In its amended pleadings plaintiff alleges that defendant infringed United States Letters Patent No. 2,614,158, issued October 14, 1952, and reissued April 26, 1955, as RE 23,987, to Robert C. Sefton and John J. Zimsky, and also Letters Patent No. 2,700,207, issued January 25, 1955, to John J. Zimsky. Plaintiff further alleges that defendant has been guilty of unfair competition in various respects. The prayer of the plaintiff is for

injunctive relief, damages, costs, and an attorney's fee.

In its answer defendant denies the operative allegations of the complaint as amended, and by way of counterclaim seeks a declaratory judgment that the patents in suit are invalid and void and that they were not infringed by defendant.

The article involved in this case is a magnetic iron core for use in electrical transformers. Such cores are manufactured and sold by both plaintiff and defendant. One of the patents owned by plaintiff covers the manufactured core and is sometimes referred to as the "apparatus patent." The other patent covers the method or process by which the core is manufactured and is at times referred to as the "method patent." [1]

The order of reference directed the Master to define and simplify the issues in the case, to receive and report the evidence on behalf of the respective parties upon all of the issues, to make necessary computations, and to make findings of fact and conclusions of law upon all of the issues.

As a preliminary matter the Master advised counsel on both sides that it was discretionary whether evidence as to damages should be submitted prior to a determination of liability; that the issues as to damages were somewhat complex; that the introduction of evidence as to damages would be both time consuming and expensive; and that it was considered preferable to make findings or determinations on the questions of validity and infringement of the patents prior to requiring the parties to submit their evidence as to damages, although either side should be considered free to introduce evidence on that issue.

Extensive hearings were held. The transcribed testimony of the witnesses covers more than 7,000 typed pages and 1190 exhibits were received in evidence.

The well-written report of the Master consists of an opening statement, a statement of the issues, a statement with regard to the incidence of the burden of proof as to the respective issues, an opinion dealing with all issues in the case other than damages, and formal findings of fact and conclusions of law. The Master found ultimately that both patents had been infringed by defendant, but that neither patent was valid, and he further found that defendant had not been guilty of unfair competition in any of the respects relied upon by plaintiff. The Master's recommendations for judgment, found in his 11th, 13th, and 14th Conclusions of Law, are that the complaint should be dismissed, that judgment should be entered in favor of defendant declaring both patents invalid, and that costs should be assessed against plaintiff, except that the parties should bear equally the costs of reporting and transcribing the proceedings before the Master and the latter's fee and expenses.

Within due time plaintiff filed exceptions to the Master's holdings of invalidity and to his findings on the claim of unfair competition. Defendant has filed exceptions to the findings of infringement. Both sides have filed extensive briefs to which due consideration has been given.

■ In passing upon the pending exceptions this Court does not try the factual issues de novo. In this connection Rule 53(e) (II) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides that the Court shall accept the Master's findings of fact "unless clearly erroneous." And a factual finding by a Master is not "clearly erroneous" unless it stems from a mistaken view of the law, or unless, although it be supported by substantial evidence, the Court is thoroughly con-

1. Patent No. 2,614,158 and its reissue are entitled "Magnetic Core." In addition to being called the "apparatus patent," this patent is known in the industry as the "Sefton and Zimsky Patent" or as "Sef-

ton et al. Patent." Patent No. 2,700,207 is the "method patent." It is entitled "Method of Making Magnetic Cores For Transformers or the Like," and is sometimes called the "Zimsky Patent."

vinced after a consideration of the evidence that a mistake has been made. United States v. Twin City Power Co., 4 Cir., 248 F.2d 108, certiorari denied 356 U.S. 918, 78 S.Ct. 702, 2 L.Ed.2d 714; Ferroline Corporation v. General Aniline & Film Corporation, 9 Cir., 207 F.2d 912, certiorari denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098; United States v. Waymire, 10 Cir., 202 F.2d 550; Sanitary Farm Dairies v. Gammel, 8 Cir., 195 F.2d 106; 2 Barron & Holtzoff, Federal Practice & Procedure, § 1170, p. 886. It may be noted that the Court is more reluctant to overturn the Master's findings where such findings are based upon conflicting testimony of witnesses who have been seen and heard by the Master than where the findings are simply logical inferences drawn by the Master from documentary evidence, depositions, or undisputed facts. United States v. 15.3 Acres of Land in City of Scranton, D.C. Pa., 154 F.Supp. 770; In re Riddlesburg Mining Co., D.C.Pa., 122 F.Supp. 560; Helene Curtis Industries v. Sales Affiliates, D.C.N.Y., 121 F.Supp. 490, affirmed 2 Cir., 233 F.2d 148, certiorari denied 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed. 2d 80; 5 Moore's Federal Practice, 2d Edition, ¶ 53.12(4), pp. 2983–2986. Of course, the Court is not bound by the Master's conclusions of law. 2 Barron & Holtzoff, op. cit. § 1170, pp. 886–887; 5 Moore's, op. cit. ¶ 53.12(5), p. 2989.

From its consideration of all of the materials before it the Court is convinced that the Master correctly conceived the law applicable to the case, that his findings are adequately sustained by substantial evidence and are not clearly erroneous, that he correctly applied the law to the facts; and that his report should be accepted and approved and judgment entered thereon.

### I. Infringement

On the patent phase of the case, the Master first considered the issue of infringement[2] and recognized that the burden of proving infringement of the respective patents by a preponderance of the evidence was upon plaintiff. 35 U.S.C.A. § 282. The Master correctly stated that the test of infringement is whether the accused device does the same work in substantially the same way and accomplishes substantially the same result, irrespective of whether there is a duplication of every literal detail. Graver Tank & Mfg. Co. v. Linde Air Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147. In Crowson v. Dennington, D.C. Ark., 141 F.Supp. 647, 651, the Court, speaking of infringement, said:

"Generally speaking, the test of infringement is whether or not the accused device performs the same work as the patented device in substantially the same way and accomplishes substantially the same result; if so, there is an infringement even though there may be variations in form, nomenclature or proportion. 40 Am.Jur. 'Patents,' Section 155, p. 643; Electric Protection Co. v. American Bank, etc., Co., 8 Cir., 184 F. 916; McKays Co. v. Penn Electric Switch Co., 8 Cir., 60 F.2d 762; Irvin v. Buick Motor Co., * * * 8 Cir., 88 F.2d 947; Montgomery Ward & Co. v. Clair, 8 Cir., 123 F.2d 878. In the case last cited the Court said: ' * * * It is settled that "to sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the

2. The propriety of considering the issue of infringement in advance of that of validy was recognized in Shakespeare Co. v. Parrine Mfg. Co., 8 Cir., 91 F.2d 199, and Irvin v. Buick Motor Co., 8 Cir., 88 F. 2d 947. Such a course is proper because the patent is presumptively valid, and if it has not been infringed, the issue of validity will not survive. Crowson v. Dennington, D.C.Ark., 141 F.Supp. 647, 650.

manner in which its different parts operate and cooperate to produce result. If the devices are substantially different in either of [those] respects, the charge of infringement is not sustained." * * * ' "

Although the Master did not decide whether defendant's product and method were identical copies of plaintiff's product and method, he did find that the doctrine of "substantial equivalents" was applicable, and that both patents had been infringed. On this point the Master said:

"Without deciding Plaintiff's contention that we are dealing with 'Chinese copies,' substantial equivalents are involved and Defendant has infringed both patents which are in suit. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605 [70 S.Ct. 854, 94 L.Ed. 1097] * *."

In Graver the doctrine of equivalents was discussed in some detail. It was there stated (at pages 608–610 of 339 U.S. at page 856 of 70 S.Ct.):

" * * * The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330 [14 L.Ed. 717], it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' * * * Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, Imhaeuser v. Buerk, 101 U.S. 647, 655, 25 L.Ed. 945, although the area of equivalence may vary under the circumstances. * * * The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. * * * In its early development, the doctrine was usually applied in cases involving devices where there was equivalence in mechanical components. Subsequently, however, the same principles were also applied to compositions, where there was equivalence between chemical ingredients. Today the doctrine is applied to mechanical or chemical equivalents in compositions or devices. * * *

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consider-

ation must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience."

The Master found that both patents held by plaintiff "relate to lap-on-top type of wound core transformer structure," that the claims of the apparatus patent were directed to the structure itself, and that the claims of the other patent covered a method of manufacturing and assembling the structure.

In the course of the proceedings it was stipulated that defendant's manufacturing procedure was as follows:

"That the Defendant constructs magnetic cores and magnetic induction apparatus; that the method of construction by Defendant includes winding magnetic strip material on a generally trapezoidal mandrel to form a plurality of concentric turns; that concurrently with and during the course of said winding, spacers are inserted between selected turns on the longer parallel side of the mandrel to provide a space factor between said selected turns; that the turns are removed from the mandrel and the spacers are removed from the turns and the turns are then bound with straps to hold them in trapezoidal shape; that the turns are annealed while so bound and held to improve the magnetic quality of the magnetic strip material; that the turns are set by such annealing into a unitary annealed article of generally trapezoidal shape; that all the turns after annealing are cut through intermediate the ends of the longer parallel side to produce a plurality of single discontinuous concentrically-nested trapezoidal shaped turns; that the turns are inserted through at least one preformed electrical winding; that the ends of the turns after such insertion are overlapped to provide a substantially rectangular magnetic core with lap joints in one of the yokes; that the turns after insertion and overlapping are bound by strapping to hold the turns in overlapped position."

The Master found that Claim No. 2 of the apparatus patent was typical of all of the claims of that patent, said claim being as follows:

"In a preformed closed core of magnetic strip material for a transformer or the like, in combination, a plurality of concentrically stacked lengthwise bent laminations, substantially all of said laminations having a permanent set to form a generally rectangular, hollow four-sided core of individual whole turns, at least one side of said core being a winding leg, a single lap joint in each of said turns along one of the sides thereof adjoining the side of said turn in said winding leg of said core, the ends of each said turn overlapping a relatively short distance and terminating along the intermediate portion of the side in which the lap joint occurs, said lap joint side

having a length when the ends thereof are in lapped position generally equal in length to the side of said turn opposite thereto, and successive ones of said turns having their lap joint sides generally parallel and their lap joints respectively in alinement."

The method patent contains seven claims all of which are alleged to have been infringed. The Master found that Claim No. 1 was representative or typical, and said claim is as follows:

"In the method of constructing a magnetic core, the steps including winding magnetic strip material on a generally trapezoidal mandrel to form a plurality of concentric turns, concurrently with said winding step inserting spacers between selected turns on the longer parallel side of the mandrel to provide a space factor between said selected turns, holding the turns in substantially their wound shape and annealing said turns while so held to improve the magnetic qualities of the magnetic strip material and to pre-set the turns into a unitary annealed article of generally trapezoidal shape, cutting through all the turns intermediate the ends of said longer side to produce a plurality of single, discontinuous, concentrically-nested turns, inserting said turns through at least one preformed electrical winding, and overlapping the ends of said turns to provide a magnetic core with lap joints in one of the yokes."

In his formal findings of fact the Master stated that defendant's stipulated method of making its transformer core structure accomplishes its result in substantially the same way as the method described in plaintiff's method patent and was an infringement thereof, that defendant's finished product is a "substantial equivalent or a substantial duplication of the structure" covered by the apparatus patent, and that both patents had been infringed.

In its exceptions and supporting brief defendant assails the Master's finding that the competing methods and products are substantial equivalents, and also invokes the rule of "file-wrapper estoppel" discussed in Schriber-Schroth Company v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132, which decision is cited in the Master's opinion.

With regard to the equivalence of the cores produced and the production methods used by the parties, the Master wrote:

"With reference to Sefton et al. Re. 23,987 [the apparatus patent], Defendant points out that the patent shows parts of the core having the same shape and relationship at the time of annealing as after final assembly and that this is not (literally) true in the Defendant's structure. Further, that the patent calls for the overlapping of each single lamination while in the Defendant's core there is usually overlapping of groups of two, three, four or five laminations; that is, single lapping of laminations as contrasted with group lapping.

"As to the Zimsky patent, No. 2,-700,207 [the method patent], both the patent and the Defendant's method provide for the winding of magnetic strip material on a generally trapezoidal mandrel. The patent describes the result as 'a trapezoidal shaped article' while the Defendant describes its result as oblong or oval shaped. Here again, it is claimed that individual overlapping as opposed to random small group overlapping is of material significance. If one follows the patent, the mandrel and spacer plates are removed after annealing. Defendant's practice is to remove the mandrel and spacer plates before annealing."

The competing products were before the Master and their construction was described and illustrated in detail. The Master also heard the expert testimony produced by both sides.

While it is manifest that the competing cores and the respective construction methods vary in some small details, the Master was warranted in concluding that there existed substantial equivalence in the cores and methods of construction, and that the minor differences were immaterial.

 As the Court understands the doctrine of "file-wrapper estoppel," said doctrine is that an ingredient of an accused device which would be considered normally as the equivalent of an ingredient in the protected device may not be claimed as such by the patentee if in the course of the proceedings in the Patent Office leading up to the issuance of the patent he has disclaimed or eliminated the ingredient for which equivalence is later claimed. In other words, once an applicant has given up an ingredient, he may not use the doctrine of equivalents to regain his ground. Schriber-Schroth Company v. Cleveland Trust Co., supra. On this point the Master wrote:

"The proceedings of the Patent Office are in evidence * * *. Defendant argues that in the Patent Office the applicants, in order to get a patent, urged that in a 'preformed' core under consideration there was a 'generally rectangular' shape and that because of the contentions and amendments in the Patent Office, the Plaintiff may not now allege that 'generally trapezoidal' or 'generally keystone' shapes are substantially equivalent to a 'generally rectangular' shape.

"The Plaintiff is not estopped from making its present claims of infringement by the amendments of the patent applications in the Patent Office or by positions which were taken there prior to the issuance of the patents."

The entire patent history was before the Master, and he was evidently unable to find therein the essential elements of "file-wrapper estoppel." The Court has given consideration to those portions of the file wrappers which have been called to its attention in this connection by counsel for defendant, and is unable to find that plaintiff waived or abandoned any of the elements which the Master found to be equivalents in the defendant's product and process. The finding of the Master that plaintiff is not estopped will be sustained.

## II. Validity

In passing upon the question of the validity of the patents the Master recognized that the patents were presumptively valid, and that the burden of showing invalidity was upon the defendant.

As its first basis of attack on the patents defendant contended that in certain respects they did not comply with 35 U.S. C.A. § 112, which provides that patent specifications shall be set out "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." The Master found the specifications sufficient, and the Court concurs in that view.

With respect to both patents the Master found that they were invalid for want of patentable invention over the prior art, and the method patent was found invalid on the further ground of public use thereof for more than a year prior to the filing of the application (35 U.S. C.A. § 102(b)).

 It is a fundamental principle of patent law, often applied in this Circuit, that in order for an article or process to be patentable it must be new and useful and must amount to an "invention." A mere improvement over prior art involving nothing more than the application of the mechanical skill to be expected of one familiar with the art upon consideration and investigation of the subject does not constitute an "invention" and is not patentable. See Caldwell v. Kirk Mfg. Co., 8 Cir., 269 F.2d 506; Miller v. Tilley, 8 Cir., 178 F.2d 526; Alemite Co. v. Jiffy Lubricator Co., 8 Cir., 176 F.2d 444; Frank Adam Electric Co. v. Colt's Pat-

ent Fire Arms Mfg. Co., 8 Cir., 148 F.2d 479; Evr-Klean Seat Pad Co. v. Stone Tire & Rubber Co., 8 Cir., 118 F.2d 600; Frederick Stearns & Co. v. Groves Laboratories, 8 Cir., 87 F.2d 822; Aro Equipment Corporation v. Herring-Wissler Co., 8 Cir., 84 F.2d 619. Further, the question of the existence of such inventiveness as will justify the granting of a patent has been judged in recent years by a stricter standard than formerly prevailed. Caldwell v. Kirk Mfg. Co. and Miller v. Tilley, both supra.

Dealing with the question of invention the Master stated:

"Much evidence was presented with respect to the 'state of the art' and to a showing of prior art * * *. Many patents and much literature are cited and argued.

"A comparison of the Sefton et al. Patent No. Re. 23,987 [apparatus patent] with earlier patents and literature reveals that the subject matter does not involve invention over the prior art, the teaching of the patent not going beyond what was discoverable through the application of mechanical skill of one familiar with the art. Reference is made to the following patents, Hassler Patent 523,572, (Defendant's Ex. A–4), Vienneau Patent 2,305,650 (Defendant's Ex. A–10), Evans Patent 2,344,295 (Defendant's Ex. A–12), Christensen Patent 2,333,461 (Defendant's Ex. A–11), Vienneau Patent 2,478,029 (Defendant's Ex. A–16), and the book 'Dynamo Electric Machinery' of 1905 of Thompson (Defendant's Ex. A–5).

"Sefton et al. Patent No. Re 23,-987 is invalid because of anticipatory prior art.

"Referring to Zimsky Patent No. 2,700,207, invalidity is contended because of the prior art, public use by Plaintiff for more than one year prior to the filing (August 2, 1952) of the application, and public use by the Defendant for more than one year prior to the filing of the application.

"The method steps in Zimsky Patent 2,700,207 are substantially similar to the method steps in Vienneau Patent 2,478,029 (Defendant's Ex. A–16), although Zimsky uses a lap joint, where Vienneau used a butt joint. The advantages and disadvantages of lap joints and butt joints are reflected in the literature, one having better electrical properties and the other being cheaper and easier to erect. Lap joints in transformer cores were known and one skilled in the art could reasonably be expected to make the choice without invention being involved.

"Zimsky Patent 2,700,207 is invalid because of the teaching of Vienneau Patent 2,478,029 when modified as one skilled in the art could be expected to modify it by substituting, if desired, a lap joint for a butt."

In addition to the foregoing statements in his opinion, the Master made six specific formal findings of fact to the effect that neither patent disclosed any invention over the prior art.

In assailing the Master's findings on the issue of validity plaintiff presses heavily upon the expertise of the Patent Office. While it is true that the patents are presumed to be valid, and while the administrative determination is entitled to weight, in the last analysis the question of validity of a patent is for judicial rather than administrative determination, and the Court holds that the Master was justified by the evidence in finding the patents to be invalid. In this connection it might be observed that the application for plaintiff's apparatus patent was twice rejected by the Patent Office on the ground that it lacked invention. Cf. Gardner v. Buxton, Inc., 8 Cir., 150 F.2d 242.

As to prior use of the method covered by the Zimsky Patent, section 102(b) of 35 U.S.C.A. provides that no patent shall be issued for an invention which was "in public use or on sale in this country, more than one year prior to the date of the application for patent," which in this

case was August 2, 1952. The burden of establishing prior use is upon the party asserting it, and that burden must be discharged by the evidence beyond a reasonable doubt. In recognition of this principle the Master wrote:

> "The burden of showing a prior public use which will invalidate a patent is upon the Defendant and is a heavy one, the obligation being to prove such use beyond a reasonable doubt. Neither an experimental use nor a secret use is sufficient. On the other hand, a single use for profit may be sufficient, and the ordinary practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use. Electric [Storage] Battery Company v. Shimadzu, 307 U.S. 5 [59 S.Ct. 675, 83 L.Ed. 1071] * * *."

■ To be convinced of a proposition beyond a reasonable doubt does not mean that the trier of the facts must be convinced beyond all doubt or to a mathematical certainty. It does mean that he must be convinced to a moral certainty, that is to say that after full consideration of all of the evidence pro and con he must have a firm and abiding conviction that the proposition in question has been established, a conviction upon which he would be prepared to act should the question arise in the more serious affairs of his own life or business.

■ It cannot be supposed that the Master, a capable lawyer experienced at the Bar of this Court, was unfamiliar with the concept of "reasonable doubt" which has just been stated. The Master found specifically that the method of constructing a transformer core disclosed by the method patent was publicly practiced by both plaintiff and defendant for more than a year prior to the date upon which plaintiff applied for the patent. The Court cannot say that the evidence does not support that finding or that the evidence was insufficient to convince the Master to the requisite degree of certainty of the prior use in question.

At an early stage of the proceedings plaintiff sought and obtained a subpoena duces tecum commanding defendant and its managing officers and agents to produce certain documents including all documents having a bearing on defendant's claims of prior development and prior use of the challenged method. After a motion to quash the subpoena had been denied, the parties named therein produced certain documents and represented that the documents produced were all that the defendant had.

After the hearings before the Master had proceeded for a considerable time and after plaintiff had rested its case and defendant had begun its own presentation, it was discovered belatedly on or about January 23, 1958, that large numbers of documents bearing on the prior use issue were in fact in the possession of defendant. The discovery of those documents was communicated immediately to the Master and to opposing counsel by one of defendant's counsel, and the documents were tendered for inspection.

On January 24, 1958, plaintiff made a number of motions before the Master for sanctions under the various subdivisions of Rule 37(b), which motions later were reduced to writing. By the motions plaintiff asked that certain oral testimony relating to production of distribution transformers by defendant during the period from February 1951 through August 1951 be stricken, that certain documentary evidence be excluded, that plaintiff be awarded expenses and attorneys' fees, that plaintiff's position with regard to prior use of the method be taken as established, that the belatedly discovered documents not be introduced, that defendant be prohibited from undertaking to prove independent development or prior knowledge and public use by defendant, that all of defendant's pleadings be stricken and plaintiff awarded a default judgment, and that specific allegations in defendant's pleadings be stricken.

The Master did not at the time take any formal action on the motions and the hearings proceeded. After the Master's

report was filed on April 1, 1960, it was supplemented by a letter dated April 22, 1960, from the Master to all attorneys in the case, and a copy was mailed to the Court. In that letter the Master found that the defendant was negligent in failing to produce the documents earlier than it did, but that the failure was not willful and resulted in no prejudice to the plaintiff. The Master denied the motions, except that he indicated that, were it not for the fact that he had already filed his report containing his recommendations as to costs, he would make an allowance to plaintiff to cover additional expenses and attorneys' fees incurred by it on account of the tardy production of the documents.

On July 16, 1960, plaintiff renewed with the Court its motions for sanctions under Rule 37(b). The Court has postponed ruling on said motion pending final disposition of the case. The granting of sanctions under the Rule is discretionary, and aside from the matter of an award of expenses and attorneys' fees, which will be referred to later, no sanctions will be allowed.

### III. Unfair Competition

■ As the Master states in his opinion, plaintiff's claim for relief on account of alleged "unfair competition" stems primarily from the fact that in the course of its operations defendant employed three employees or former employees of plaintiff. It is claimed by plaintiff that those individuals were wrongfully hired by defendant, that said individuals disclosed certain "trade secrets" of plaintiff, and that they disclosed certain alleged confidential information to defendant, all to the damage of plaintiff.

The Master gave very careful consideration to both the legal and factual aspects of this claim. While recognizing that unfair competition of the type claimed by plaintiff is actionable if established, the Master was of the opinion, and found, that plaintiff's claim had no basis factually, that there was no impropriety in the hiring of any of the three individuals

above mentioned, that defendant received from those men no trade secrets of plaintiff or any information as to plaintiff's business or operations which said employees were required to keep confidential, and that defendant, in essence, did not compete unfairly with plaintiff.

In the Court's estimation the plaintiff's claim of unfair competition involved essentially factual issues to be resolved in the light of proper legal criteria of which the Master appears to have been thoroughly cognizant, and the Master's resolution of those issues in favor of defendant has adequate evidentiary support.

### IV. Miscellaneous

■ 1. It is the recommendation of the Master that the costs in the case be assessed against plaintiff, except that the expense of the transcript of the proceedings before the Master and the Master's fee be shared equally.

The defendant objects to being charged with one-half the expense of the transcript and with one-half of the Master's fee, particularly in view of the fact that it objected to the issue of unfair competition being referred to the Master. Since the defendant is winning the case and since the issue of unfair competition standing alone was not such as would normally be referred to a Master, defendant's objections are not without substance. However, as indicated, the Master found that defendant had been negligent in failing to produce the documents that have been mentioned. That delay doubtless resulted in added expense which defendant ought to bear, at least in part. However, since defendant is being charged with one-half of the expense of the transcript and with one-half of the Master's fee, no award will be made to plaintiff to reimburse it for expenses incurred on account of defendant's delay in producing the documents, nor will any award of attorney's fee be made to plaintiff. Taxation of costs and expenses in a case of this kind is discretionary, and the Court in the exercise of its discretion will adhere to the recom-

mendation contained in the Master's Report of April 1, 1960.

2. The Court has been advised by the Master that in the course of the proceedings he received periodic compensation from the parties and has been paid in full for his services. Hence, there is no occasion for the Court to fix an additional fee for the Master whose duties have been discharged at all stages in a capable and impartial manner.

3. The file in the case is replete with interlocutory motions, requests, and objections of various kinds which it is unnecessary to mention separately. Such motions, requests, and objections, as far as they have not been ruled upon or rendered moot by this opinion, are denied to the extent that they are inconsistent with the ultimate result here reached.

An appropriate decree will be entered.